UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERISURE MUTUAL INSURANCE
COMPANY (f/k/a Michigan Mutual
Insurance Company),

       Movant,

v.

EVEREST REINSURANCE COMPANY
(f/k/a Prudential Reinsurance Company),

       Respondent.

_____/

Case No. 14-cv-13060
Hon. Matthew F. Leitman

**OPINION AND ORDER GRANTING MOVANT'S MOTION TO
CONFIRM ARBITRATION AWARD (ECF #2) AND
DENYING RESPONDENT'S MOTION TO VACATE
ARBITRATION AWARD (ECF #23)**

## INTRODUCTION

This is a reinsurance coverage dispute between Movant Amerisure Mutual Insurance Company ("Amerisure"), and its reinsurer, Respondent Everest Reinsurance Company ("Everest").    After a nine-day, highly-contentious arbitration hearing, an arbitration panel awarded Amerisure over $14 million. Amerisure now moves to confirm the arbitration award (*see* ECF #2); Everest moves to vacate it.  (*See* ECF #23.)  For all of the reasons stated below, the Court **GRANTS** Amerisure's motion and **DENIES** Everest's motion.

## RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    The Parties and the Direct Access Treaty

Amerisure is a property and casualty insurance company.    In 1979, Amerisure purchased "reinsurance" from Everest.   "'In essence, reinsurance is insurance for insurance companies,' whereby a reinsured (here, [Amerisure]), cedes some of its risk to a reinsurer (in this case, [Everest]), and shares its premium with the reinsurer." *Certain Underwriters at Lloyd's London v. Westchester Fire Ins. Co.*, 489 F.3d 580, 582 n. 1 (3d Cir. 2007) (quoting *Cont'l Cas. Co. v. American Nat'l Ins. Co.,* 417 F.3d 727, 729 n. 1 (7th Cir. 2005)).   Amerisure purchased its reinsurance from Everest under a series of treaties.

1

The treaty in place between July 1979 and July 1988 is referred to as the "Direct Access Treaty." (*See* ECF #28-1.)  This treaty was amended several times while it was in force. (*See* the "Endorsements," *id.* at 3-27, Pg. ID 242-266.)

The Direct Access Treaty provided that "with respect to each occurrence," Everest would indemnify Amerisure for the amount of "net loss under [the] casualty business of [Amerisure] … in excess of the 'Company Retention.'" (*Id.* at 40, Pg. ID 279.)  The Direct Access Treaty defined an "occurrence" as "each accident or occurrence or series of accidents or occurrences arising out of one event." (*Id.* at 43, Pg. ID 282.)  The "Company Retention" was a $500,000 "per occurrence" deductible that Amerisure had to satisfy before it was entitled to indemnification from Everest.  (*Id.* at 40, Pg. ID 279.)

## B.   The Direct Access Treaty Contained Exclusions From Coverage and Exceptions to Those Exclusions

The original version of the Direct Access Treaty included five specifically-numbered exclusions from coverage.[1] (*Id.* at 40-41, Pg. ID 279-280.)  These exclusions provided that Everest would not indemnify Amerisure for losses arising out of, among other things, "insurance written by [Amerisure's] aviation unit,"

---

[1] These five enumerated exclusions appear in the "Exclusions" section of the Direct Access Treaty under the heading "Liability Other than Auto."  (*See* ECF #28-1 at 40, Pg. ID 279.) The Direct Access Treaty also included a standalone sixth exclusion for "[t]rucks used for transporting explosives or munitions" under a separate heading titled "Automobile Liability."  (*Id.*)

insurance related to the "handling and shipping" of explosives, and bodily injuries arising out of riots. (*Id.*)

The original version of the Direct Access Treaty also contained an exception to the listed exclusions.  This exception provided that an otherwise-applicable exclusion would not bar indemnification if the trigger for the exclusion was merely an incidental part of the insured's overall operations:

> If [Amerisure] provide[s] insurance for an insured with respect to any premises, operations or products listed in one or more of the exclusions and such premises, operations or products constitute only a minor and incidental part of the total premises, operations or products of the insured such exclusion(s) shall not apply.

(The "Generally-Applicable Incidental Exception to the Treaties' Exclusions," *id.* at 41, Pg. ID 280.)

Effective July 1, 1987, the parties adopted an endorsement to the Direct Access Treaty. (*See* the "1987 Endorsement," *id.* at 6-7, Pg. ID 245-246.)  The 1987 Endorsement added four new specifically-numbered coverage exclusions beyond the five exclusions listed in the original treaty.  The newly-added ninth exclusion precluded indemnification for certain asbestos-related losses if either (1) Amerisure knew that its insured's operations presented a risk of asbestos exposure or (2) the insured's asbestos exposure was generally recognized (the "Asbestos Exclusion").  But this new exclusion provided that it did not apply to (and would not preclude indemnification for) certain specified asbestos-related activities if

3

those activities were merely incidental to an insured's operations (the "Incidental Exception Language in the Asbestos Exclusion"). The entire text of this exclusion was as follows:

SECTION 2 – EXCLUSIONS, is amended to include the following:

[….]

9. Bodily injury (including occupational disease) and/or property damage arising from the manufacture, removal, installation, storage, mining, handling or transportation of asbestos if the insured's operations, at the time of the policy issuance, present known and/or generally recognizable asbestos exposures; however, this exclusion shall not apply to the removal, installation, storage, handling or transportation of asbestos if such removal, installation, storage, handling or transportation is incidental to the insured's operations:

The term "incidental" as used in this exclusion is intended to recognize the fact that certain insureds (such as, but not limited to, plumbing, carpentry, etc.) will infrequently, but regularly, encounter asbestos within the scope of their operations – even though their operations, as such, do not involve the manufacture, removal, installation, storage, mining, handling, or transportation of asbestos. This Exclusion does not apply to such "incidental" operations.

(*Id.* at 6-7, Pg. ID 245-246.)

The 1987 Endorsement expressly provided that all of the Direct Access Treaty's "other terms and conditions" – i.e., those not specifically modified or deleted in the endorsement – "shall remain unchanged." (*Id.* at 9, Pg. ID 248.) The 1987 Endorsement did not purport to modify or delete the Generally-Applicable Incidental Exception to the Treaties' Exclusions. Thus, the modified version of the

4

Direct Access Treaty contained *both* the Incidental Exception Language in the Asbestos Exclusion *and* the Generally-Applicable Incidental Exception to the Treaties' Exclusions.

## C.   The Woods Treaties

In 1988 and 1989, Everest provided reinsurance to Amerisure under a series of six additional contracts that the parties refer to as the "Woods Treaties" (together with the Direct Access Treaty, the "Treaties"). (*See* ECF ## 28-2 – 28-7.)   The Woods Treaties expressly stated that Amerisure was permitted to aggregate individual losses in order to satisfy its $500,000 deductible.  (*See, e.g.*, ECF #28-2 at 13, Pg. ID 307.)  Except for this difference, the Woods Treaties and the Direct Access Treaty were similar in all respects relevant to this dispute.  For example, the Woods Treaties contained virtually the same Asbestos Exclusion included in the 1987 Endorsement to the Direct Access Treaty.[2]  The Woods Treaties also contained the Incidental Exception Language in the Asbestos Exclusion and the Generally-Applicable Incidental Exception to the Treaties' Exclusions. (*See id.* at 7-8, Pg. ID 301-302.)

---

[2] The Woods Treaties contained one additional sentence in the Asbestos Exclusion that was not included in the 1987 Endorsement: "However, the term incidental does not contemplate the Reinsured knowingly writing operations classified as asbestos removal or installation."  (ECF #28-2 at 7, Pg. ID 301.)  This difference is not relevant to the motions before the Court.

**D.    The Treaties' Arbitration and Choice of Law Provisions**

The Treaties all contained arbitration provisions that required the parties to submit "any dispute arising out of [the treaties] … to the decision of a board comprised of two arbitrators and an umpire...." (Direct Access Treaty at 34-35, Pg. ID 273-274; *see also* the Woods Treaties at ECF #28-2 at 19-20, Pg. ID 313-314.) The arbitration provision in the Direct Access Treaty stated that "the laws of the State of Michigan shall govern any arbitration proceedings."   (Direct Access Treaty at 34, Pg. ID 273.)   The Woods Treaties did not contain any choice-of-law provision.   (*See, e.g.,* ECF #28-2 at 19-20, Pg. ID 313-314; ECF #28-3 at 18, Pg. ID 343; ECF #28-4 at 19-20, Pg. ID 373-374; ECF #28-5 at 17-18, Pg. ID 402-403; ECF #28-6 at 18-19, Pg. ID 432-433; ECF #28-7 at 17-18, Pg. ID 461-462.)

**E.    Everest Denied Indemnification for Amerisure's Asbestos-Related Losses, and Amerisure Demanded Arbitration**

During the terms of the Treaties, Amerisure provided insurance coverage to a steam trap manufacturer, [**Company X**] ("[**Company X**]").   [**Company X**] and one of its affiliates, [**Company Y**], manufactured products that included parts containing asbestos.   Certain individuals made claims against [**Company X**] and [**Company Y**] for asbestos-related injuries that were allegedly caused by these products.

In 2006, Amerisure notified Everest that [**Company X**] and [**Company Y**] had received these claims.   (*See* ECF #32-17, Pg. ID 1996-1197.)   Over the course

6

of several years, Amerisure indemnified [**Company X**] and [**Company Y**] for some of these claims (the "Amerisure Asbestos Losses").  When considered in the *aggregate*, the dollar amount of the Amerisure Asbestos Losses far exceeded the $500,000 Company Retention under the Treaties.  (*See, e.g.,* ECF #32-20, Pg. ID 1221-1222.)  But it appears that the dollar amount of each *individual* claim for which Amerisure indemnified [**Company X**] and [**Company Y**] was less than the Company Retention.

In 2009, Amerisure sought indemnification from Everest for the Amerisure Asbestos Losses.  Everest rejected Amerisure's claim on May 3, 2010.  (*See* the "Denial Letter," ECF #32-19 at 3-4, Pg. ID 1218-1219.)  In the Denial Letter, Everest asserted that the Direct Access Treaty "required" Amerisure to satisfy its $500,000 deductible "on a per occurrence" basis. (*Id.* at 3, Pg. ID 1218.)  In other words, Everest contended that Amerisure could not aggregate the individual losses that comprised the Amerisure Asbestos Losses into a single "occurrence" in order to exceed the Company Retention and thereby qualify for indemnification.

Everest also asserted that the Asbestos Exclusion, as included in the 1987 Endorsement and in the Woods Treaties, precluded indemnification for the Amerisure Asbestos Losses. (*See id.*)  Everest contended that [**Company X**] "was a manufacturer of asbestos containing products, and such products necessarily presented known or generally recognizable asbestos exposures." (*Id.*)  Everest also

asserted that the Incidental Exception Language in the Asbestos Exclusion did not apply because Amerisure's insured, [**Company X**], produced asbestos-containing products: "As an insurer of a <u>manufacturer</u> of asbestos containing products, Amerisure cannot avail itself of the 'incidental' exception which is limited to incidental/infrequent 'removal, installation, storage, handling, or transportation' of asbestos during an insured's operations. Manufacturing operations are not included in the exception." (*Id.*; emphasis in original.)

Amerisure demanded arbitration on October 10, 2011. (*See* ECF #32-20, Pg. ID 1221-1222.) In its arbitration demand, Amerisure wrote that it had "made certain payments pursuant to [its insurance policies with] [**Company X**] [] and will make additional payments in the future." (*Id.* at 2, Pg. ID 1221.) Amerisure sought indemnification from Everest in the amount of $3,210,153 (for the Amerisure Asbestos Losses it had already paid) and for amounts to be paid in the future. (*See id.*)

**F.    Everest and Amerisure Appointed Their Party Arbitrators and Selected Roger Moak as Umpire for Their Arbitration**

Amerisure and Everest each appointed one arbitrator to the three-member hearing panel (the "Panel"). Amerisure chose Andrew Maneval ("Maneval"), and Everest chose James White ("White"). The parties then proceeded to choose a neutral "umpire" to complete the Panel. While the Treaties specified that the two party-selected arbitrators would jointly choose the umpire, it appears that Everest

8

suggested a different process. (*See, e.g.,* ECF ## 41-3, 41-4, Pg. ID 2155, 2157-2159.) Everest proposed that the parties simultaneously exchange lists, each identifying six umpire candidates. (*See* ECF #41-4 at 3, Pg. ID 2158.) The parties would then confer and determine if any umpires were included on both lists. (*See id.*) If the parties listed twelve different umpire candidates, conflict questionnaires would be sent to all twelve, and the parties would then re-confer and complete a "ranking" procedure to select the umpire. If there were any candidates listed by both parties, only those candidates would be sent a questionnaire, and the parties would then complete the "ranking" procedure to select the umpire. (*See id.*)

It is unclear from the record before this Court whether Amerisure agreed to this "ranking" procedure in its entirety. However, Amerisure did send a list of six proposed umpires to Everest on February 17, 2012. (*See* ECF #33-13, Pg. ID 1438.) One of the umpires Amerisure listed was Roger Moak ("Moak"), an experienced umpire in the insurance/reinsurance industry. (*See id.*)

On February 29, 2014, counsel for Amerisure and Everest jointly e-mailed Moak, informed him that he had been nominated as an umpire candidate, and asked that he fill out a questionnaire addressing, among other things, his prior dealings with the parties, their counsel, and their party-selected arbitrators. (*See* ECF #41-5, Pg. ID 2161-2169.) Moak completed the questionnaire and disclosed that he had previously been appointed as an arbitrator "in an arbitration against

9

Everest," but that the case had settled prior to arbitration. (Moak's Completed Questionnaire, ECF #31-12 at 2, Pg. ID 795.) Moak also disclosed that he had never served on an arbitration panel with Maneval, that he had participated in arbitrations with White, and that he had previously served as an umpire in cases involving Amerisure's counsel. (*See id.* at 3-4, Pg. ID 796-797.) Ultimately, the parties selected Moak as the umpire and informed Moak of his selection in a joint communication from Maneval and White. (*See* ECF #28-9, Pg. ID 483-484.) There is no evidence in the record before the Court that Moak was ever told how he had been selected to serve as the umpire and/or told anything about the role of either party in his selection.

## G.   The Panel Granted Everest a Multiple-Month Adjournment and Reopened Discovery

The arbitration hearing was scheduled to begin in June 2013. On May 17, 2013, Everest requested an adjournment. (*See* ECF #32-23, Pg. ID 1230-1238.) Everest told the Panel that "a recent development drastically reshape[d] the issues in this matter." (*Id.* at 1, Pg. ID 1230.) Everest said that it received documents from [**Company X**] which "establish[ed] that [**Company X**] represented a 'known and/or generally recognizable' asbestos exposure as of 1987" and therefore precluded Amerisure's claim for indemnification by operation of the Asbestos Exclusion. (*Id.*) Everest requested that the arbitration be delayed and that discovery be reopened on this issue. Amerisure vigorously opposed Everest's

10

"extraordinary request" and urged the Panel to "summarily reject[]" it.  (ECF #32-24 at 1, Pg. ID 1240.)   By "majority vote,"[3] the Panel granted Everest's motion, albeit, in Moak's words, "most reluctantly."  (ECF #32-25, Pg. ID 1244.)

## H.   Moak Made Additional Disclosures at the Start of the Hearing

Following Everest's additional discovery, the arbitration hearing began on April 24, 2014.  That same day, Everest's counsel asked Moak to disclose on the record whether he had been nominated as an umpire by either side, or their counsel, in any other matter.  (*See* the "Arbitration Transcript," at 307, ECF #41-2 at Pg. ID 2152.)  Moak responded that Everest's request was unprecedented and improper.  (*See id.*)   Moak also said that he was not necessarily aware in any given case which party actually nominated him. (*See id.*)  Everest's counsel said that he "realize[d]" that Moak "might know and [] might not know" who nominated him, and that Moak "probably [did] not" know who nominated him in any specific case. (*Id.*)

Moak nonetheless attempted to list the arbitrations in which attorneys from the law firms representing Everest and Amerisure were involved and had potentially nominated him.  (*See id.* at 307-310, Pg. ID 2152.)  Moak further said that he thought "he [had] been nominated in a couple of cases in which Mr.

---

[3] Because the decision to adjourn the arbitration hearing and reopen discovery was made by a "majority vote," and not by a "unanimous vote," it appears that Maneval dissented from this ruling.

Maneval is an arbitrator but I didn't – I wasn't retained.  And I may have been nominated in a couple of cases in which Mr. White was an arbitrator and I wasn't retained.  But I didn't have time to do the research necessary to figure all that out."

(*Id.* at 309, Pg. ID 2152.)

Before the hearing began, Moak made a further disclosure about interactions he had with the two party-selected arbitrators, Maneval and White:

> I omitted to disclose at the outset that several weeks ago Mr. Maneval and I went to the Metropolitan Museum together based on my fulfilling a pledge I made to him that I would take him to the Metropolitan Museum and give him a tour of the American wing, which is an invitation to anybody else.  Many members of the ARIASA club have had that tour, and I love doing it.  So you are all invited.
>
> The other thing is Mr. White and I shared a limo he arranged, a limo service he arranged and he didn't let me reimburse him for it, but I did pay for the bell man.  I treated for the bell man. […] Now the record is as complete as I can make it.

(*Id.* at 457-458, ECF #41-2 at Pg. ID 2153.)

## I.   The Key Issues in Dispute at the Hearing

During a nine-day arbitration hearing, the Panel heard testimony from more than a dozen witnesses (including experts) and reviewed scores of exhibits.  Three contested issues before the Panel are now at issue in this action.  Those issues were:

> 1.   Under the Direct Access Treaty, could Amerisure treat the individual losses that, collectively, comprised the Amerisure Asbestos Losses, as a single "occurrence" that

12

satisfied the $500,000 "per occurrence" Company Retention, or was each of the individual underlying losses a separate and standalone "occurrence"?

2.   Did the Asbestos Exclusion preclude indemnification for the Amerisure Asbestos Losses, or did an exception to that exclusion apply that would preserve Amerisure's right to indemnification?

3.   Did Amerisure's demand for arbitration seek indemnification for losses that Amerisure paid to [**Company Y**], or did the demand seek indemnification solely for amounts paid to [**Company X**], itself?

**J.    Moak and Everest's Counsel Clashed During the Hearing, but When Specifically Asked to Identify Any Way in Which Moak Prevented Everest From Presenting Its Case, Everest's Counsel Identified Only a Single Limitation on Cross-Examination**

At various times during the arbitration, Moak appeared frustrated with how Everest presented its case. For example, at one point during Everest's questioning of a witness, Moak asked Everest to "move on" and said that Everest's counsel was "go[ing] over and over – you are arguing with the witness. We know what the witness has to say…." (Arb. Tr. at 2527, ECF #31-21 at Pg. ID 837.) Moak and Everest's counsel then had the following colloquy:

Everest's counsel: Well, there are a few nuances to this thing that I think are bringing – worth bringing out. If you don't want to hear it, I will close my book and sit down. Thank you.

Moak: Fine. That's your choice.

Everest's counsel: It's a choice I'm not given by you, Roger, because you keep telling me you don't want to hear the evidence, and that's really a problem.

13

> Moak: I never said that [].  That's unfair and I resent it.  []
>
> Everest's counsel: I'm sure you do.
>
> Moak:  You're – you're repetitive asking about – I have let you get away with a lot already [].  So if you have another question, which isn't repetitive, which isn't arguing with the witness, go ahead and ask it.  If it is argumentative or it is repetitive, then sit down.  Okay.  It's your choice.
>
> [….]
>
> Everest's counsel:  I'm going to sit.  I don't think I have any choice.

(*Id.* at 2527-2529, Pg. ID 837.)

At the conclusion of the hearing on May 7, 2014, Moak asked counsel for Everest if he had any objections as to how the Panel allowed Everest to present its case, and counsel for Everest identified only a single objection:

> Moak: With respect to the panel's affording you an opportunity to present your arguments and your evidence, are you satisfied that the panel allowed you to submit your evidence and your arguments?
>
> Everest's counsel: Subject to the situation that I identified on the record where I felt we were not.
>
> Moak:  Where I cut you off from your cross-examination.  Is that what you are talking about?
>
> Everest's counsel:  Yes.
>
> Moak:  Anything else?  I will let the record speak for itself with respect to that.
>
> Everest's counsel: I think it does, I think it does.
>
> Moak: Anything else that you want to say?
>
> Everest's counsel: No.  Thank you.

(Arb. Tr. at 3655-3656, ECF #40-6, Pg. ID 1992-1993.)

**K.      Everest Filed a Post-Arbitration Sanctions Motion That Angered Moak**

On May 13, 2014, prior to the start of the Panel's deliberations, Everest sought sanctions on the ground that Amerisure "flouted its discovery obligations in this matter and thereby deprived Everest of key evidence."  (ECF #31-25 at 2, Pg. ID 859.)  Everest argued that "[t]he prejudice resulting from Amerisure's failure to engage in good faith discovery is not calculable, *but has been exacerbated by the Panel's denial of Everest's right to introduce pertinent and material evidence at the final hearing, and the Panel applying a different standard to Everest with respect to the introduction of evidence*."  (*Id.*; emphasis added.)

Everest's allegations irritated Moak.  In a May 14, 2014, e-mail to Maneval and White, Moak wrote:

> Jim and Andrew, I was preliminary inclined to rule, mostly at least, in favor of Everest since before the hearing started, which is why I've been impatient with [Everest's counsel's] exaggerations, repetitions, and overkill tactics.  While I'm still so inclined, I have to tell you that accusations aimed at me about Everest's being denied a fair hearing piss me off!  Of course, I'll put that aside whenever we get to deliberate.

(ECF #32-27 at 4, Pg. ID 1260.)

**L.      Moak Made Yet Another Disclosure**

Following the conclusion of the arbitration hearing, but before the Panel issued its ruling, Moak made an additional disclosure to the parties.  Moak wrote in an e-mail, sent over the July Fourth holiday, that "in accordance with my

15

continuing disclosure obligation, I was notified this morning that I have been selected as an umpire in an arbitration in which Mr. Maneval is a party-appointed arbitrator."  (ECF #31-18, Pg. ID 815.)

At no time did either party seek to disqualify Moak due to his relationships or past interactions with the parties or attorneys involved in the arbitration.  Nor did either party ever seek to disqualify Moak on *any* grounds.  While Everest complained in its sanctions motion that "the Panel" applied a different standard to Everest's request to admit evidence, Everest never suggested during the arbitration that Moak was unfit to serve as umpire nor suggested that he harbored a bias that prevented him from being fair.

## M.    The Panel Awarded Amerisure Over $14 Million

Following in-person deliberations, the Panel issued its "Decision and Final Award" on July 25, 2014.  (*See* the "Final Award," ECF #22-2, Pg. ID 182-188.) Moak and Maneval signed the Final Award; White issued a dissent.  (*See* White's dissent, ECF #31-20.)[4]   The Final Award "direct[ed] Everest to indemnify Amerisure for Everest's share of the asbestos loss … which amount is $14,123,907.40 as of March 31, 2014."  (Final Award at 7 at ¶d, Pg. ID 188.)

---

[4] Unless specified otherwise, the Court's references to "the Panel" when discussing the Final Award refer to the two-person majority that signed the Final Award (Moak and Maneval).

The Panel began the Final Award by providing a "procedural history" of the dispute. (*See id.* at 1-3, Pg. ID 182-184.) In this section, the Panel explained that "[a]fter due deliberation" the Panel had ruled "on the morning of the hearing's final day that the [**Company Y**] claims were 'in the case.'" (*Id.* at 2, Pg. ID 183.)

The Panel then provided its "Findings and Conclusions." (*See id.* at 3-6, Pg. ID 184-187.) Before listing these conclusions in numbered paragraphs, the Panel first noted that it did "not intend to comment [in the Final Award] on every noteworthy witness and exhibit in this arbitration." (*Id.* at 4, Pg. ID 185.) Instead, the Panel said that it intended "to provide the Parties with the findings and conclusions upon which [its] rulings on the principal issues have most heavily relied. Of course, [the Panel's failure] to mention additional or contrary evidence and testimony is not intended to imply that it was not considered by the Panel." (*Id.*)

The Panel first noted that the meaning of the key disputed contract terms was far from clear and that it was applying rules of contract construction applicable to ambiguous language:

> 2.    The applicable arbitration clause calls for the panel's decision to be made 'with regard to the custom and usage of the insurance and reinsurance business.' Complying with this charge was anything but straightforward inasmuch as the two well-credentialed and articulate principal expert witnesses offered opinions of treaty interpretation that were totally at odds on the two central issues.

> 3. There is well-founded precedent in the law which favors resolving ambiguous contract language in insurance contracts in favor of finding coverage and against the contract drafter, which in this case the evidence showed was Everest.

(*Id.* at 4, ¶¶2-3, Pg. ID 185.)

The Panel then explained that based upon its review of the testimony, evidence, and case law, it had determined that the Direct Access Treaty *did* allow Amerisure to aggregate the individual losses that comprised the Amerisure Asbestos Losses into a single "occurrence":

> 4. The only percipient witness who testified about drafting some treaty language was Everest's former underwriter [**Person A**], and he testified substantially in favor of Amerisure's treaty interpretations and in support of Amerisure's demand for payment. In support of Everest's position, two other Everest underwriters … testified about how they would interpret the treaty language in question, but neither of them was involved in the treaty underwriting, and neither of them denied that [**Person A**] knew more about it.

> 5. Everest offered the opinion testimony of experienced expert witness (and former broker) John Chaplin to rebut [**Person A**'s] fact testimony and to rebut opinion testimony from Amerisure's experienced expert witness (and former underwriter) James Macdonald. Mr. Chaplin's testimony was largely based on sources which we find to be considerably less authoritative than he did. We also find unpersuasive his responses to questioning about how – given the restrictive interpretation of the undefined word 'event' in the treaty's occurrence definition – products liability coverage could ever apply to latent injury losses such as from asbestos. We find that placing the product into the

18

stream of commerce was the 'event' for purposes of the reinsurance cession.

6.     Having considered all of the conflicting interpretations presented on the treaty's occurrence definition (and the absence of an event definition[)], we find that is commonly accepted in the business that the extension of event-based language to include occurrences, where applicable to underlying product liability exposures, covers a single occurrence the insured's liability for an asbestos-containing product for each policy year.  We reach this outcome … because this is the way we believe much of the industry has come to define such excess of loss reinsurance coverage and because it is the only way that any reasonable understanding of casualty reinsurance coverage can apply to the emergence of continuous-injury asbestos products liability exposures. We also find support in *International Surplus Lines Ins. Co. v. Certain Underwriting Syndicates at Lloyd's*, 868 F. Supp. 917 (S.D. Ohio 1994) *and Employers Ins. Co. of Wausau v. Certain Underwriters at Lloyd's*, 552 N.W.2d 420 (Wis. Ct. App. 1996).

7.     We do not find that Amerisure's claim is precluded or undercut by the fact that the underlying claims were settled as individual losses.  Clearly, the occurrence language of [Amerisure's insurance policies with [**Company X**] and the occurrence definition in the [Direct Access Treaty] are completely different, and the latter in no way depends or is dictated by the former .... The Everest claim handler's view on this point, as it applied to the cession in this case (Transcript pp. 2788-2789), supports this finding.

(*Id.* at 4-5, ¶¶5-7, Pg. ID 185-186.)

The Panel next turned to whether the Asbestos Exclusion prohibited Amerisure's claim for indemnification for the Amerisure Asbestos Losses.  The

19

Panel explained that in considering that issue, it had to analyze both the exclusion

itself and whether an exception to the exclusion applied:

> 8.    The drafting history is more complete on the other principal
> issue of interpretation, i.e., the applicability of the modified
> asbestos exclusion added to the treaty terms in 1987 [i.e., the
> Asbestos Exclusion].    The documentary evidence and
> testimony indicates that, after years of treaty coverage with
> no asbestos exclusion at all, Everest proposed an absolute
> asbestos exclusion, which Amerisure rejected.  The modified
> exclusion eventually adopted contained a significant
> exception to the exclusion [i.e., the Incidental Exception
> Language in the Asbestos Exclusion].  Its wording raises
> two questions: Did the insured's operations, at the time of
> policy issuance, present known and/or generally
> recognizable asbestos exposures? And, Was [sic] that
> exposure incidental to the insured's overall operations?

(*Id.* at 5, ¶8, Pg. ID 186.)

The Panel concluded that [**Company X**] did not present "known and/or

generally recognizable asbestos exposures" and that the Asbestos Exclusion

therefore did not bar Amerisure's claim for indemnification:

> 9.    The fact testimony from the Amerisure, [**Company X**], and
> broker witnesses was that the asbestos claims started in 1992
> for [**Company Y**] and 1998 for [**Company X**] – years after
> the addition of the [Asbestos Exclusion].  Everest did offer a
> few documents which appear to show that Amerisure may
> very well have been aware by 1987 of the fact that
> [**Company X**'s] steam traps contained an encapsulated
> asbestos gasket.  A couple even indicated that by 1987 there
> could have been a few very small asbestos losses.  On the
> other hand, [**Company X**'s] workers' compensation
> insurance was written by Amerisure during the relevant
> timeframe, and it experienced no claims for asbestos related
> injury, and the Manufacturing Safety Data Sheet issued to

20

the gasket manufacturer also indicated that the product was safe.  In sum, it appears that it was Amerisure's subjective underwriting judgment, as manifested by the absence of an exclusion in its policies, that the encapsulated asbestos gaskets [**Company X**] used did not constitute a known exposure.

10.   On the question of whether [**Company X**'s] products presented a generally recognizable asbestos exposure … both [of Everest's expert witnesses] expressed their belief that, by the mid-1980s, it was already well known in the insurance marketplace that the mere existence of any asbestos-containing product contained a generally recognizable exposure.  [Amerisure's expert witness] had already testified to the contrary, and his recollections conform more closely with our own.

(*Id.* at 5-6, ¶¶9-10, Pg. ID 186-187.)

Importantly, the Panel then ruled that even if the Asbestos Exclusion otherwise applied, Amerisure could nonetheless avoid that exclusion by operation of the Generally-Applicable Incidental Exception to the Treaties' Exclusions. (*See id.*, ¶12, Pg. ID 187.)  The Panel quoted that exception verbatim and held that it *was* "applicable." (*Id.*)

Finally, the Panel discussed whether Amerisure could avoid the Asbestos Exclusion by operation of a second exception to that exclusion – namely, the Incidental Exception Language in the Asbestos Exclusion:

11.   Given [our ruling that the Asbestos Exclusion does not apply], we may not even need to reach the issue raised by the 'incidental' exception drafted into the modified exclusion [i.e., the Incidental Exception Language in the Asbestos Exclusion].  Nevertheless, despite Everest's

21

argument and its expert's opinion that the exception as intended to apply only to certain named exposures, namely, from contractors, we find that the 'not limited to' language indicates that the contractors example was not intended to be exhaustive. Moreover, we view this interpretation of the exception in light of the push-back from Amerisure – seeking more protection for its underwriting objections – on the exclusion generally.

(*Id.* at 6, ¶11, Pg. ID 187.)

The Panel did not award Amerisure all of the relief that it sought. For example, the Panel, by a unanimous vote, "[d]enie[d] Amerisure's demands for interests and attorney fees." (*Id.* at 7, ¶g, Pg. ID 188.)

## N.    Amerisure and Everest Filed Dueling Motions in This Court

On July 31, 2014, Amerisure filed its Motion to Confirm Final Arbitration Award in this Court. (*See* the "Motion to Confirm," ECF #2.) Everest filed its Motion to Vacate Final Arbitration Award on October 24, 2014. (*See* the "Motion to Vacate," ECF #23.)

Everest moves to vacate the Final Award on four primary grounds: (1) Moak displayed "evident partiality" and was biased against Everest, (2) the Panel denied Everest a fair hearing; (3) the Panel exceeded its powers when it ruled that Amerisure could aggregate the individual asbestos losses that comprised the Amerisure Asbestos Losses and that the Asbestos Exclusion did not preclude coverage; and (4) the Panel exceeded its powers when it awarded damages for

22

amounts Amerisure paid to [**Company Y**].  The Court heard arguments on both motions on February 11, 2015.

## ANALYSIS

**A.    Governing Law and Standard of Review: The Federal Arbitration Act vs. Michigan Law**

The Final Award covers seven reinsurance treaties – and various revisions and endorsements – that the parties executed during their relationship.  All of the contracts involve interstate commerce and are thus subject to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 et seq.  *See Uhl v. Komatsu Forklift Co.*, *Ltd.,* 512 F.3d 294, 303 (6th Cir. 2008).  But even where the FAA applies, parties may contractually agree that state law governs their arbitration proceedings, and federal courts will generally enforce such an agreement. *See Savers Prop. & Cas. Ins. Co. v. Nat'l Union Fire Ins. Co.*, 748 F.3d 708, 715-716 (6th Cir. 2014).

Here, one of the reinsurance treaties – the original 1979 Direct Access Treaty – provides that "the law of the State of Michigan shall govern any arbitration proceedings." (Direct Access Treaty at 34, Pg. ID 273.)  This provision arguably requires application of Michigan law to a motion to confirm and/or vacate an award issued pursuant to the Direct Access Treaty. *See Savers*, 748. F.3d at 715-716 (holding that similar provision required application of Michigan law concerning judicial review of arbitration awards).   The other six reinsurance treaties – the Woods Treaties – say nothing about Michigan law (or the law of any

23

State).  In the absence of a reference to state law, the FAA supplies the governing standard of review for an award issued under those treaties. *See, e.g., id.* at 716 ("The central inquiry in this choice-of-law determination is whether the parties unambiguously intended to displace the FAA with state rules of arbitration").

These divergent choice of law provisions could create a thorny conflicts question.  But they do not.  "The first imperative of a conflict-of-laws problem is: a conflict. When all roads lead to the same result, there is no conflict to resolve." *In Re Dow Corning Corp.*, --- F.3d ---, 2015 WL 716299, at *8 (6th Cir. Feb. 20, 2015) (Sutton, J. dissenting).  And here, there is scant conflict between Michigan arbitration law and the FAA.  Indeed, "Michigan's arbitration law is almost identical to the FAA in all relevant respects." *Uhl,* 512 F.3d at 303.

Everest acknowledges that "Michigan law is similar to the FAA as to the legal standards governing" essentially all of its challenges to the Final Award – those based upon the "evident partiality [of the Umpire], the panel's refusal to hear evidence, the panel's conduct of the hearing, and the panel's consideration of post-hearing information on damages." (Everest's Supp. Br., ECF #45 at 3, Pg. ID 2476.)  Since the "choice-of-law determination bears little impact on [the Court's] analysis or disposition" of those challenges to the Final Award, the Court need not decide whether Michigan law displaces the FAA with respect to them. *Savers*, 748 F.3d at 716.  The Court will analyze them under the FAA.

But this Court must "consider specific application of Michigan law where the relevant provisions [of that law and the FAA] differ in substance." *Id.* Everest insists that Michigan law and the FAA differ with respect to "the standard of review applicable to whether the panel exceeded its powers in ruling in Amerisure's favor on the occurrence and asbestos exclusion issues under the Direct Access Treaty." (Everest's Supp. Br. at 3, Pg. ID 2476.)   Everest argues that Michigan law permits a much more searching review of whether an arbitrator exceeded his authority. (*Id.*) (citing *Detroit Auto. Inter-Insurance Exch. v. Gavin*, 331 N.W.2d 418, 430 (Mich. 1982)).   However, the difference, if any, between Michigan law and the FAA with regard to reviewing whether the Panel exceeded its powers is not nearly as significant as Everest suggests.

Under the FAA, "[t]he burden of proving that the arbitrators exceeded their authority is very great…." *Solvay Pharmaceuticals, Inc. v. Duramed Pharmaceuticals, Inc*., 442 F.3d 471, 476 (6th Cir. 2006) (quoting *Nationwide Mutual Insurance Company v. Home Insurance Company*, 330 F.3d 843, 846 (6th Cir. 2003)).   "The terms of the contract define the powers of the arbitrator, and 'as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.'" *Id.* (quoting *United Paperworkers Int'l Union v. Misco, Inc*., 484 U.S. 29, 38 (1987)); *see also*

25

*Michigan Sugar Co. v. Bakery, Confectionary, Tobacco Workers, and Grain Millers International Union*, 278 Fed. App'x 623, 628 (6th Cir. 2008) (no basis to vacate arbitration award "even if the Arbitrator made a 'bizarre' and 'unsupported' finding because [courts] are directed to tolerate even 'serious, improvident, or silly' legal or factual errors") (quoting *Michigan Family Resources, Inc. v. SEIU 517M*, 475 F.3d 746, 753 (6th Cir. 2007)).

Likewise, under Michigan law, "[h]istorically, judicial review of arbitration awards [has been] highly limited." *Miller v. Miller*, 707 N.W.2d 341, 345 (Mich. 2005) (citing *Gavin*, 331 N.W.2d at 418).[5]  Courts applying Michigan law take a cautious approach to claims that arbitrators have exceeded their powers.  Indeed, the Michigan Supreme Court has directed courts to "carefully evaluate[]" a party's "allegation that the arbitrators have exceeded their powers … in order to assure that this claim is not used as a ruse to induce the court to review the merits of the

---

[5] Like the FAA, Michigan law precludes a court from "'review[ing] an arbitrator's factual findings or decision on the merits.' A reviewing court is also prohibited from engaging in contract interpretation, which is an issue for the arbitrator to determine."  *Muskegon Central Dispatch 911 v. Tiburon, Inc.*, 462 Fed. App'x 517, 524 (6th Cir. 2012) (quoting *City of Ann Arbor v. AFSCME Local 369*, 771 N.W.2d 843, 854 (Mich. Ct. App. 2009)).  "Nor may a court substitute its judgment for that of the arbitrator. […] If, in granting the award, the arbitrator did not disregard the terms of his or her employment and the scope of his or her authority as expressly circumscribed in the contract, judicial review effectively ceases.  Thus, as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, a court may not overturn the decision even if convinced that the arbitrator committed a serious error." *City of Ann Arbor*, 771 N.W.2d at 854 (internal citations and punctuation omitted) (emphasis added).

arbitrators' decision." *Gordon Sel-Way, Inc. v. Spence Brothers, Inc.*, 475 N.W.2d 704, 701 (Mich. 1991). A court applying Michigan law must presume that an arbitration award is "*within* the scope of the arbitrators' authority absent express language to the contrary" and should be "*reluctant* to vacate or modify an award when the arbitration agreement does not *expressly limit* the arbitrators' power in some way." *Id*. (Emphasis added.) Under Michigan law, arbitrators run a "high risk" of exceeding their powers only where they disregard "express and unambiguous contract terms." *Gavin*, 331 N.W.2d at 430.

Given the substantial similarities between Michigan law and the FAA, there is no need to determine whether Michigan law displaces the FAA with respect to Everest's claim that the Panel exceeded its powers in interpreting the Treaties. However, out of an abundance of caution, the Court will analyze Everest's argument that the Panel exceeded its powers under both the FAA and Michigan law.[6]

---

[6] If forced to choose between the FAA and Michigan law in reviewing whether the Panel exceeded its powers, the Court would choose the FAA. As noted above, the Final Award covers all seven Treaties between the parties, and only the Direct Access Treaty mentions Michigan law. Thus, there is an ambiguity as to which law the parties intended to govern review of a <u>single</u> arbitration award that applied to <u>both</u> a treaty incorporating Michigan law (the Direct Access Treaty) <u>and</u> treaties governed under the FAA (the Woods Treaties). In the face of such an ambiguity, the FAA applies. *See, e.g., Martis v. DISH Network Services, LLC*, --- Fed. App'x ---, 2015 WL 74712, at *3 (6th Cir. Jan. 7, 2015) ("Ambiguities [between whether the FAA or state law applies] are resolved in favor of the federal standard"). And it makes more sense to apply the FAA given that six of the seven Treaties at issue in the Final Award say nothing about Michigan law.

**B.      Everest is Not Entitled to Relief From the Final Award Based Upon Moak's Alleged Evident Partiality**

Everest first moves to vacate the Final Award on the ground that "Moak exhibited evident partiality."   (Everest Br., ECF #32 at 11, Pg. ID 1091.) Specifically, Everest argues that:

- Moak "developed a social relationship with Maneval" – Amerisure's chosen arbitrator – and was "tilted" toward Amerisure in order to curry favor with, and receive additional umpire appointments from, Maneval and Amerisure's counsel. (*Id.* at 11-13, Pg. ID 1091-1093.);

- Moak "repeatedly criticized Everest's counsel" for seeking an adjournment of the originally-scheduled May 2013 hearing, and he held this request against Everest throughout the arbitration proceedings.  (*Id.* at 13-15, Pg. ID 1093-1095.); and

- Moak "conducted the hearing in a manner that exhibited evident partiality for Amerisure and bias and animosity against Everest."   Among other things, Moak precluded Everest from introducing certain exhibits, interfered with its examination of witnesses (including expert witnesses), and repeatedly ruled in favor of Amerisure during the arbitration. (*Id.* at 15-24, Pg. ID 1095-1104.)

Everest cites Moak's May 14, 2013, e-mail as further evidence of Moak's partiality.  According to Everest, the e-mail shows that Moak was initially inclined to rule in its favor, but that he "changed on his minds on the merits" and "ruled against Everest in all material respects" in retaliation for the criticisms Everest levied against him.  (*Id.* at 24-25, Pg. ID 1104-1105.)

28

### 1.    Everest Has Failed to Preserve Its Evident Partiality Challenge

"As a general rule, a grievant must object to an arbitrator's partiality at the arbitration hearing before such an objection will be considered by the federal courts." *Apperson v. Fleet Carrier Corporation*, 879 F.2d 1344, 1358-1359 (6th Cir. 1989); *see also Questar Capital Corporation v. Gorter*, 909 F.Supp.2d 789, 814 (W.D. Ky. 2012) ("A party cannot remain silent as to perceived or actual partiality or bias and then later object after the [arbitration] panel reaches an unfavorable decision").  Everest did not object to Moak's partiality during the arbitration.  On the contrary, when given a clear opportunity to claim that it had been harmed by Moak's partiality – at the close of the arbitration hearing, when Moak asked Everest directly if Everest had been given a sufficient "opportunity to present [its] arguments and [its] evidence" – Everest said *nothing* about any alleged partiality.  (*See* Arb. Tr. at 3655-3656, ECF #40-6 at Pg. ID 1992-1993.)  To be sure, Everest did vigorously object to the merits of many rulings made by Moak – before, during, and after the arbitration hearing – but an objection that an arbitrator or umpire made an incorrect legal ruling is manifestly different from an objection to that individual's ability to be fair.

At the motion hearing before this Court, Everest suggested that its failure to object to Moak's alleged partiality should be excused.  Everest cited the Sixth Circuit's decision in *Thomas Kinkade Company v. White*, 711 F.3d 719, 724-725

29

(6th Cir. 2013), for the proposition that objecting to a neutral arbitrator's partiality may offend the neutral, and Everest suggested that it acted reasonably in withholding an objection to Moak's partiality.  But *Kinkade* does not authorize this Court to review Everest's evident partiality claim even though Everest failed to raise the issue with Moak.  The Sixth Circuit in *Kinkade* simply emphasized that a neutral arbitrator should not engage in conduct that places a party in the uncomfortable position of having to object to his partiality.  The court did not take the additional step – urged by Everest here – of holding that an objection to a neutral's partiality may be excused because it is awkward to make.  Indeed, the party seeking to vacate the award in *Kinkade did* object to the neutral arbitrator's partiality, and the Sixth Circuit did not disturb the district court's ruling that, pursuant to *Apperson*, a contemporaneous objection was a pre-requisite to federal court review. *See Thomas Kinkade Company v. Lighthouse Galleries*, *LLC*, 09-10757, 2010 WL 436604, at *6 (E.D. Mich. Jan. 27, 2010) (following rule that parties objecting to arbitrator's partiality must "make an objection if they wished to preserve the issue for review, even at the risk of contributing to [the arbitrator's] disfavor of their cause").  While it is undoubtedly uncomfortable for a party to argue to a neutral umpire that he is partial, *Kinkade* simply cannot be read as

overruling *Apperson* and permitting federal court review *absent* an objection.[7]  For all of these reasons, Everest's failure to timely object to Moak's alleged partiality cannot be excused.

Since Everest did not object to Moak's partiality during the arbitration, Everest has failed to preserve essentially all of its partiality challenge.  At a minimum, it has no right to challenge Moak's partiality based upon events occurring before and/or during the arbitration hearing because such a challenge could have been presented to Moak prior to the Final Award.  The only aspect of Everest's evident partiality claim that is preserved is Everest's argument that Moak's post-hearing, pre-deliberation e-mail establishes his evident partiality.

### 2.    On the Merits, Everest's Evident Partiality Claim Fails

Even though the Court concludes that Everest has preserved only a tiny fraction of its evident partiality claim, the Court will review the entire claim on the merits.  The claim fails.

-------

[7] The concept that a party must raise a bias objection with the allegedly-biased decision-maker is not new.  Nor is it limited to arbitration proceedings.  Indeed, despite any perceived awkwardness, it is well-recognized in both state and federal courts that a party must object to a decision-maker's partiality in order to preserve the partiality issue for review.  *See, e.g., Goward v. United States*, 569 Fed. App'x 408, 410 (6th Cir. 2014) ("A motion to disqualify [a judge] must first be presented to the judge whose impartiality is questioned" before it can be reviewed on appeal); *see also In Re Forfeiture of $53.00*, 444 N.W.2d 182, 189 (Mich. Ct. App. 1989) (claim of judicial bias was "not properly before" appellate court because party had failed to move to disqualify the judge during a bench trial).

An arbitration award may be vacated on the basis of evident partiality only where "a reasonable person would have to conclude that an arbitrator was partial to the other party to the arbitration." *Apperson*, 879 F.2d at 1358. In order to warrant relief, "[t]he alleged partiality must be direct, definite, and capable of demonstration, and the party asserting evident partiality must establish specific facts that indicate improper motives on the part of the arbitrator." *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 329 (6th Cir. 1998) (internal quotation marks omitted). Simply put, a claim of evident partiality requires two showings: (1) a motive for the alleged bias and (2) "concrete actions in which [the arbitrator] appeared to actually favor" the disadvantaged party. *Kinkade*, 711 F.3d at 724. Everest has shown neither.

Everest has failed to establish that Moak had any motive to favor Amerisure. Everest hypothesizes that Moak treated Amerisure better because he wanted to secure additional umpire engagements from Amerisure and its counsel (*see* Everest Br., ECF #32 at 12-13, Pg. ID 1092-93), but this theory is both illogical and unsupported by the facts in this record. If, as Everest claims, Moak was interested in securing more work as a neutral umpire, then unfairly favoring Amerisure would have been decidedly *counterproductive*. The selection of a neutral umpire often requires the consent of *both* parties (as it did here), and thus a neutral who earns a reputation as favoring insurers over reinsurers (or, indeed, a reputation of playing it

any way other than "straight down the middle") would quickly find himself with *less* work, not more. Simply put, a neutral "arbitrator is in a private business enterprise. His or her reputation for neutrality is a badge of honor, and *an essential credential in getting business*." Commentary, "ADR v. The Bench: Why Are Neutrality Standards Different," 25 *Alternatives to the High Cost of Litigation* 65, 74 (April 2007) (emphasis added). And case law confirms that in the very type of arbitration at issue here – one involving a reinsurance dispute – neutral umpires appear to be selected based upon their "reputation for legal acumen and *impartiality*." *Sphere Drake Ins. Ltd. v. All American Life Ins. Co.*, 307 F.3d 617, 619 (7th Cir. 2002) (explaining basis for repeated selection of a neutral umpire in reinsurance arbitrations) (emphasis added).[8] The relevant financial incentives would have pushed Moak to be fair to both sides, not to favor Amerisure.

Everest also lacks evidentiary support for its claim that Moak had a motive to favor Amerisure. There is no evidence in this record that Moak knew which party nominated him as the umpire nor that he knew how he was ultimately selected to serve in that capacity. Moreover, as Everest acknowledged on the record during the arbitration proceedings, neutral umpires may often not know

---

[8] *See also Malone v. Superior Court*, 173 Cal. Rptr. 3d 241, 255, n. 19 (Cal. App. 2014) ("A less pessimistic view would take the position that an arbitrator with a reputation for bias would have a short career indeed; arbitrators with reputations for fair resolution of disputes regardless of their own short-term financial interests would be in greater demand in the long run").

33

which party nominated them. (Arb. Tr. at 307, ECF #41-2 at Pg. ID 2152.)  Everest

has failed to show that Moak had any reason to believe that favoring Amerisure

would benefit him financially down the road.

Moreover, there is no evidence that Moak attempted to hide any arbitration

engagements involving Amerisure's counsel and/or Amerisure's party-arbitrator

(Maneval).  In fact, the record establishes just the opposite: Moak disclosed his

relationships with the other arbitrators and the lawyers, and he even e-mailed the

parties over the Fourth of July weekend to inform them he was chosen as an

umpire in another case in which Maneval was an arbitrator.  It is telling that during

the arbitration hearing, Everest never suggested that any of Moak's disclosed

engagements gave him a motive to favor Amerisure.[9]

And Everest makes far too much of Moak's May 14th e-mail.  Everest views

the e-mail as a "smoking gun" – as definitive proof that Moak must have ruled

against Everest based upon his animus toward the company.  Everest's argument is

as follows: (1) Moak's e-mail shows that he was inclined to rule in favor of Everest

at the close of the nine-day arbitration hearing; (2) the key event following the

---

[9] Likewise, the fact that Moak may have had a social relationship with Amerisure's
party-arbitrator (Maneval) and that he gave Maneval a tour of an art museum falls
well short of establishing that Moak was biased against Everest.   Indeed,
"[a]rbitrators are often chosen for their expertise and community involvement, so
'[t]o disqualify any arbitrator who had professional dealings with one of the parties
(to say nothing of a social acquaintanceship) would make it impossible, in some
instances, to find a qualified arbitrator at all.'"   *Uhl*, 512 F.3d at 308 (quoting
*Nationwide*, 429 F.3d at 646-647).

conclusion of hearing was Everest's sanctions motion containing the criticisms of Moak's rulings; (3) after being "piss[ed] off" by Everest's accusations, Moak ruled against Everest; and (4) Moak's change of heart can only be explained by his anger with Everest.

There are two fundamental flaws in Everest's argument. First, in the e-mail, Moak said that *even after Everest's "accusations," he was "still … inclined" to rule in Everest's favor*, and he committed that he would "put aside" his frustration with Everest "whenever we get to deliberate." (ECF #32-27 at 4, Pg. ID 1260; emphasis added.) Thus, Moak's statements in his e-mail, when read in their entirety, undercut Everest's claim that its accusations and criticisms led Moak to change his mind.

Second, Everest's argument omits a critical event that occurred between Moak's e-mail and the Final Award: the face-to-face deliberations between and among the Panel. Everest too quickly dismisses the possibility that the deliberations could have been meaningful; that Amerisure's party arbitrator, Maneval, may have been more persuasive than Everest's party arbitrator; and that Moak may have discarded his initial inclination in favor of Everest after carefully reviewing the evidence and considering Maneval's views.

Everest also places far too much emphasis on Moak's statement that he was "piss[ed] off." The fact that Moak may have been frustrated (even extremely

35

frustrated) with Everest as he headed into deliberations does not mean he lost the capacity to fairly evaluate Everest's position on the merits. Indeed, it is not uncommon for decision-makers like arbitrators and judges to grow frustrated with attorneys for a wide variety of reasons, including criticisms of their rulings. Feeling that frustration is a natural part of the job; it is not evidence that the decision-maker cannot fulfill his oath and duty to be fair. *See, e.g., Consolidated Rail Corp. v. Yashinsky*, 170 F.3d 591, 597 (6th Cir. 1999) ("A court's statement to counsel that indicates frustration with counsel's behavior is not enough to establish bias or prejudice").

Everest has also failed to show that Moak materially favored Amerisure in an unfair manner. Everest likens this case to *Kinkade* in which the Sixth Circuit held that an arbitrator unfairly favored one party. In *Kinkade*, "the coincidences *all* [broke] one way." *Kinkade*, 711 F.3d at 720 (emphasis added). That did not happen here. Indeed, Everest's own complaints of unfair treatment show conclusively that Moak did not always favor Amerisure. For instance, Everest complains that Moak held a grudge because Everest moved to adjourn the originally May 2013 hearing date, but Everest cannot escape the fact that Moak *granted* Everest's urgent request for the adjournment, and reopened discovery – all over Amerisure's vigorous objections. Similarly, Everest complains that at the start of the hearing, Moak refused to admit into evidence a substantial number of

documentary exhibits proposed by Everest.  But Moak *did* allow Everest to offer the documents into evidence individually during the course of the hearing (with him ruling on their admissibility as they were offered) and Moak *denied* Amerisure's request to exclude the exhibits.  (*See* ECF #32-30, Pg. ID 1271.) Likewise, Everest claims that Moak wrongly allowed Amerisure to present the Panel with a post-hearing submission supporting Amerisure's interest calculation, but the Panel ultimately rejected Amerisure's demand for interest.  Finally, the Panel denied Amerisure's request for attorneys fees.

For all of these reasons, the Court concludes that even if Everest's evident partiality claim is preserved for review, there is no basis to vacate the Final Award based on Moak's supposed partiality.

## C.   Everest is Not Entitled to Relief From the Final Award Based on How the Panel Conducted the Arbitration Proceedings

Everest argues that the Court should vacate the Final Award because the Panel's allegedly-erroneous procedural and evidentiary rulings deprived Everest of a fair hearing.  Everest complains that the Panel wrongfully refused to allow Everest to introduce certain exhibits at the arbitration, interfered with its examination of lay and expert witnesses, unfairly favored and helped rehabilitate Amerisure's experts, and generally favored Amerisure at every opportunity.  (*See* Everest Br., ECF #32 at 15-25, Pg. ID 1095-1105.)   The short answer to this argument is that Everest's broad criticisms of the Panel are fundamentally

37

inconsistent with Everest's answer to Moak's end-of-hearing question as to whether the Panel had given Everest a fair opportunity to present its case. As noted above, Everest identified only a single complaint in response to that inquiry. (Arb. Tr. at 3655-3566, ECF #40-6 at Pg. ID 1992-1993.) Everest is thus on extremely weak ground when it now claims to have been deprived of a fair arbitration hearing in myriad ways.

The longer answer is that "evidentiary decisions of arbitrators should be viewed with unusual deference," *Terk Technologies Corp. v. Dockery*, 86 F.Supp.2d 706, 709 (E.D. Mich. 2000) (internal quotation marks omitted), and Everest has fallen far short of showing that the Panel's evidentiary and procedural errors deprived Everest of a fair arbitration hearing.[10] Indeed, many of Everest's complaints about the hearing ring hollow:

- Everest argues that Moak "fawned" over Amerisure's expert witnesses, but Amerisure has identified portions of the arbitration transcript that show Moak questioning the qualifications of Amerisure's expert (*see* Arb. Tr. at 1795, ECF #33-26 at Pg. ID 1527);

- Everest argues that the Panel prevented it from offering exhibits into evidence, but as described in detail above, the Panel actually refused to grant Amerisure's motion to strike the exhibits and expressly allowed Everest the

---

[10] S*ee also U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*, 591 F.3d 1167, 1175 (9th Cir. 2010) ("[a]rbitrators enjoy 'wide discretion … to admit or exclude evidence, how and when they see fit.'") (quoting *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1444 (11th Cir. 1998)).

opportunity to move the admission of the exhibits on an individual basis (*see* ECF #32-30, Pg. ID 1271); and

- Everest complains that the Panel allowed Amerisure to file a post-hearing submission supplementing the evidentiary record related to Amerisure's claim for interest (*see* ECF #31-38, Pg. ID 1057-1059 describing and objecting to Amerisure's submission), but the Panel ultimately declined to award any interest.

Everest has failed to show that the Panel conducted the hearing in an unfair manner and/or that it suffered any unfair prejudice as a result of the manner in which the Panel conducted the hearing.

## D. Everest Has Failed to Show That the Panel Exceeded Its Powers in a Manner Warranting Vacatur of the Final Award

The Panel faced two primary issues of contract interpretation and application: (1) did the Direct Access Treaty permit Amerisure to aggregate the individual losses that comprised the Amerisure Asbestos Losses into a single claim for indemnification and (2) did the Asbestos Exclusion bar Amerisure's claim for indemnification?  The Panel ruled that Amerisure *could* aggregate the individual losses that comprised the Amerisure Asbestos Losses and that the Asbestos Exclusion was *no* bar to indemnification.  Everest argues that in so ruling, the Panel exceeded its powers and dispensed its "own brand of industrial justice."  The Court disagrees.  As explained below, the Panel did not exceed its powers in allowing Amerisure to aggregate, and while one aspect of the Panel's ruling on the Asbestos Exclusion did exceed the Panel's powers, the ruling was supported by an

39

alternative ground that was within the Panel's powers.

> ### 1.    The Panel's Conclusion That Amerisure Could Aggregate the Individual Losses That Comprised the Amerisure Asbestos Losses Under the Direct Access Treaty

The Panel ruled that the individual losses that comprised the Amerisure Asbestos Losses could be treated as a single "occurrence" or "series of occurrences arising out of one event."  (Final Award at 4-5, Pg. ID 185-186.)  Under the FAA, this Court must affirm that ruling so long as, in reaching the ruling, the Panel was "even arguably construing or applying the contract and acting within the scope of [its] authority." *Nationwide*, 429 F.3d at 643.  It was.

As described in detail above, the Panel first determined that the definition of "occurrence" – with its use of the undefined term "event" – was ambiguous as to whether it permitted aggregation.  (*See* Final Award at 4, ¶¶2-3, Pg. ID 185.)  This conclusion is hardly surprising, and is defensible, in light of the fact that "the two well-credentialed and articulate principal expert witnesses offered opinions of treaty interpretation that were totally at odds." (*Id.* at ¶2.)  Indeed, given that each side asked the Panel to look beyond the "four corners" of the Direct Access Treaty and to consider expert testimony about the meaning of terms "occurrence" and "event," the Panel had every right to find the language ambiguous.[11]

---

[11] Everest highlights that "[n]either party argued [at the arbitration hearing] that [the "occurrence" definition] was ambiguous."  (Everest Br., ECF #31 at 17, Pg. ID 523.)  But "the fact that both parties argue that [a] contract is unambiguous does

The Panel then "considered all of the conflicting interpretations presented on the treaty's occurrence definition (and the absence of an event definition)," and it found the interpretation offered by witness [**Person A**] ("[**Person A**]") to be the most persuasive. (*Id.* at 4, ¶¶4-5, Pg. ID 185.)  The Panel stressed that [**Person A**] was the "only percipient witness" – the only person with a connection to the drafting of the language in question – and that he "testified substantially in favor of Amerisure's treaty interpretations and in support of Amerisure's demand for payment." (*Id.* at ¶4.)  Simply put, [**Person A**] testified that aggregation was fully consistent with the definition of "occurrence" and "event":

> Q:   Turn again to the treaty … And I'm going to direct your attention to [where the treaty defines the word occurrence]. Is that an example of an occurrence definition which permits the combination of multiple losses?
>
> A:   Yes it does.
>
> Q:   And how so?
>
> A:   It provides for losses arising out of occurrence, whether it be multiple insured's or multiple coverage parts and arising out of one event.

---

not preclude … [a] finding [that] the contract [is] ambiguous." *Pitcher v. Principal Mutual Life Insurance Company*, 870 F.Supp. 903, 907, n. 1 (S.D. Ind. 1994); *see also E.R. Squibb & Sons, Inc. v. Lloyd's & Companies*, 241 F.3d 154, 179 (2d Cir. 2001) ("reject[ing] both parties' positions" that endorsement in insurance contract was unambiguous).  Indeed, the fact that the parties offered starkly different definitions and supported those definitions with expert testimony and with detailed and reasonable arguments tends to *confirm* the Panel's ruling that the term is susceptible to different interpretations – that it is ambiguous.

Q:     Okay.  Do you see the reference there to a series of accidents or occurrences?

A: Yes.

Q:     And do you believe that allows for more than one accident or occurrence, more than one claim to be combined into a single occurrence if they all arise out of the same event?

A:     I do, yes.

Q:     Do you believe that a series of products losses can    arise out of one event?

A:     Yes.

Q:     And as you read this clause, can the manufacture of a product that includes an asbestos component constitute an event?

A:     Yes.

[….]

Q:     Do you have an understanding as to whether [an] event [as defined in the treaty] could be something that occurs over a period of time?

A:     Event is a very broad word.  And it could be something that occurs over a period of time, yes.

Q:     And when you say 'over a period of time,' how long could that be?  Could that be multiple years?

A:     It could be, sure.

(Arb. Tr. at 503-506; 511-512, ECF #42-6 at Pg. ID 2223-2224.)  The Panel found

[**Person A**'s] testimony in support of Amerisure's interpretation especially

persuasive because he was employed *by Everest* when the Direct Access Treaty

42

was drafted. (*See* Final Award at 4, ¶4, Pg. ID 185.)  The Panel also relied upon case law that, in its view, supported its conclusion that aggregating losses was consistent with the definitions of "occurrence" and "event." (*See id.* at 4-5, ¶6, Pg. ID 185-186.)

The Panel further considered and rejected the evidence that Everest offered in support of its argument that the Direct Access Treaty did not allow the aggregation of the individual losses that comprised the Amerisure Asbestos Losses. The Panel found that evidence substantially less persuasive than the evidence offered by Amerisure.  (*See id.* at ¶6.)

In short, the Panel followed a customary interpretive path.  It first determined that an ambiguity allowed it to look beyond the four corners of the Direct Access Treaty.  It then analyzed the competing extrinsic evidence as to the meaning of the terms "occurrence" and "event" and as to whether aggregation of the individual losses that comprised the Amerisure Asbestos Losses was consistent with those terms, as Amerisure argued.  It found Amerisure's evidence more persuasive and adopted the interpretation supported by that evidence.  That is classic – and reasonable – contract interpretation.  Such interpretation fell squarely within the Panel's authority.  The FAA bars this Court from upsetting that interpretation.

Everest counters that another passage in the Final Award proves that the Panel impermissibly deviated from the plain language of the "occurrence" definition. Everest points to the Panel's statements that allowing the aggregation of the individual losses that comprised the Amerisure Asbestos Losses (1) "*is* commonly accepted in the business" and (2) comports with how "much of the industry *has come to define* such excess of loss reinsurance coverage." (*Id.*; emphasis added.) Everest argues that the Panel's use of the *present* tense shows that the Panel was answering the wrong question: instead of determining the intent of the parties when they used the terms "occurrence" and "event" in the Direct Access treaty more than twenty years ago, the Panel rested its decision on how the relevant terms could be understood under current industry standards.

The Court acknowledges that the Panel's use of the present tense is a bit confounding. The Panel did not draw a connection between the *current* meaning of the disputed terms and the commonly accepted meaning of those terms when the parties entered into the Direct Access Treaty. Without such a link, the current meaning is not relevant to the issue that the Panel was asked to resolve: namely, when the parties executed the Direct Access Treaty, did they intend to allow aggregation of individual losses, like those that comprised Amerisure Asbestos Losses, into a single claim for indemnification?

44

Although the Panel did appear to consider the current meaning of the disputed terms, the Court is not convinced that the Panel actually rested its ruling on that meaning rather than upon their meaning when the parties entered the Direct Access Treaty.  As described above, the Panel expressly relied on the testimony of a percipient witness who had a connection to the original drafting of the disputed language and upon the testimony of experts as to what that language meant.  The Court is convinced that even though the Panel used some imprecise language in the Final Award, the Panel did engage in proper contract interpretation, and the Court cannot disturb that interpretation under the FAA. *See, e.g., Solvay*, 442 F.3d at 476.

Nor does Michigan law permit the Court to upset the Final Award on the ground that the Panel exceeded its powers in allowing aggregation of the individual losses that comprised the Amerisure Asbestos Losses.  As explained in detail above, the Panel's resolution of the aggregation issue is not plainly at odds with any express and unambiguous term of the Direct Access Treaty, and, more specifically, is not fundamentally irreconcilable with the treaty's definition of "occurrence."  Indeed, interpreting ambiguous contractual terms, as the Panel did in this case, is a far cry from exceeding an express contractual term in violation of Michigan law. *See Muskegon Central Dispatch 911*, 462 Fed. App'x at 524-25 (explaining that an arbitrator does not exceed his powers under Michigan law

45

where he "engag[es] in contract interpretation" but does exceed his powers when he ignores the "plain language" of a contract).

At bottom, Everest's argument that the Panel exceeded its authority by allowing aggregation is nothing more than an invitation to review the merits of the Panel's contract interpretation. The Michigan Supreme Court has directed courts to reject such an invitation. *See Gordon Sel-Way,* 475 N.W.2d at 704. This Court heeds that direction here, as it must.

### 2. The Panel's Conclusion That the Asbestos Exclusion Did Not Preclude Indemnification

As described in detail above (*see* pp. 2-5), the Direct Access Treaty (as amended in 1987) and the Woods Treaties both contained the Asbestos Exclusion and two possibly applicable exceptions to the Asbestos Exclusion. These exceptions were the Incidental Exception Language in the Asbestos Exclusion and the Generally-Applicable Incidental Exception to the Treaties' Exclusions.

The Panel considered *both* whether the Asbestos Exclusion applied *and* whether, even if the Amerisure Asbestos Losses would otherwise fall within that exclusion, Amerisure was nonetheless entitled to indemnification by operation of one of the two above-described exceptions to the exclusion. (*See* Final Award at 5-6, ¶¶ 8-12, Pg. ID 186-187.) The Panel resolved both issues in Amerisure's favor. The Panel first determined that the Asbestos Exclusion did not apply because [**Company X**'s] asbestos exposure was neither known to Amerisure nor

46

generally-recognized. (*See id.* at ¶¶ 9-10.) The Panel then ruled that even if the Asbestos Exclusion would otherwise apply (and bar indemnification), Amerisure was still entitled to indemnification because the Generally-Applicable Incidental Exception to the Treaties' Exclusions was "applicable." (*Id.* at 6, ¶12, Pg. ID 187.) Everest argues that these rulings exceeded the Panel's powers.

The Court agrees with Everest that the Panel exceeded its powers when it concluded that Amerisure could avoid the Asbestos Exclusion on the ground that it did not know about [**Company X**'s] asbestos exposure. However, Everest has failed to show that the Panel exceeded its powers in ruling that the Generally-Applicable Incidental Exception to the Treaties' Exclusions was "applicable," such that Amerisure was entitled to coverage even if the Asbestos Exclusion otherwise applied and precluded indemnification.

### a.   Everest Has Established That the Panel Exceeded its Powers When it Ruled That [Company X's] Operations Did Not Present a Known Asbestos Exposure

The Panel acted directly contrary to the plain language of the Asbestos Exclusion – and thereby exceeded its powers – when it ruled that Amerisure could avoid the Asbestos Exclusion because it did not know about [**Company X**'s] asbestos exposure. The Panel acknowledged that documents introduced by Everest "appear[ed] to show that that Amerisure may very well have been aware by 1987 [before the parties executed the Direct Access treaty] of the fact that [**Company**

X's] steam traps contained an encapsulated asbestos gasket." (*Id.* at 5, ¶9, Pg. ID 186.)  The Panel also acknowledged that other documents "even indicated that by 1987 there could have been a few very small asbestos losses." (*Id.*)  The Panel, however, dismissed these documents because "[**Company X**'s] workers' compensation insurance was written by Amerisure during the relevant timeframe," and Amerisure "experienced no claims for asbestos-related injury" and did not include in [**Company X**'s] workers' compensation policy an exclusion for asbestos-related claims. (*Id.*)  The Panel announced its holding on the knowledge-of-exposure issue as follows: "In sum, it appears that *it was Amerisure's underwriting judgment* as manifested by the absence of an exclusion in its policies, *that the encapsulated asbestos gaskets* [**Company X**] *used did not constitute a known exposure*." (*Id.;* emphasis added.)

But the relevant question under the Asbestos Exclusion has *nothing* to do with Amerisure's subjective "underwriting judgment."  The question is whether Amerisure objectively knew about [**Company X**'s] asbestos exposures.  The Panel did not answer that question.  Instead, it replaced the contractually-mandated inquiry into Amerisure's knowledge of the exposure with its own inquiry into Amerisure's subjective assessment about the extent of the exposure.  Even under the deferential review mandated by the FAA, such a wholesale departure from the plain language of the contract cannot stand. *See, e.g., Michigan Family Resources,*

475 F.3d at 753  ("[W]e cannot ignore the specter that an arbitration decision could be so ignorant of the contract's plain language as to make implausible any contention that the arbitrator was construing the contract") (internal citation and punctuation omitted).  And it certainly cannot withstand review under Michigan's law which requires vacatur where an arbitrator acts contrary to unambiguous contractual language.  *See Gavin*, 331 N.W.2d at 430.

Amerisure attempts to insulate the Panel's treatment of the knowledge issue from review.  It argues that the Panel made a "factual finding" that Amerisure lacked knowledge, and it insists that under both the FAA and Michigan law, this Court may not review such a finding. (Amerisure Opposition Brief, ECF #40 at 19-20, Pg. ID 1959-1960.)  If the Panel had made such a finding, Amerisure would be right.  But the Panel made no such finding.  As described above, instead of finding that Amerisure did not know about [**Company X**'s] asbestos exposure, the Panel found "that it was Amerisure's *underwriting judgment*" that there was no "known exposure."  (Final Award at 5, ¶9, Pg. ID 185.)  And the Court is unwilling to hold – in the face of the Panel's statement that it resolved the knowledge issue based on Amerisure's underwriting judgment – that the Panel made some sort of implicit or unstated factual finding that Amerisure lacked knowledge.  For all of these reasons, the Panel exceeded its powers when it ruled that Amerisure could avoid

the Asbestos Exclusion on the ground that it did not know that [**Company X**'s]

operations presented a known asbestos exposure.

>    **b.**   **Everest Has Failed to Establish That the Panel Exceeded its Powers When it Ruled That the Generally-Applicable Incidental Exception to the Treaties' Exclusions Was "Applicable"**

As described in detail above, the Generally-Applicable Incidental Exception

to the Treaties' Exclusions provided that even if one of the Treaties' enumerated

exclusions would preclude indemnification for a loss caused by a product, Everest

would nonetheless indemnify Amerisure if the product in question was a minor and

incidental part of an insured's total products.  (*See* Direct Access Treaty at 40-41,

Pg. ID 279-280.)  The Panel ruled that this exception was "applicable" and, thus,

that the Asbestos Exclusion did not bar Amerisure from receiving indemnification

from Everest.  (Final Award at 6, ¶12, Pg. ID 187.)  Everest has barely attempted

to show – and certainly has not demonstrated –  that the Panel exceeded its powers

in concluding that the Generally-Applicable Incidental Exception to the Treaties'

Exclusions was "applicable."

Indeed, even though Amerisure's briefing urged this Court to uphold the

Panel's ruling that the Generally-Applicable Incidental Exception to the Treaties'

Exclusions was "applicable" – and to confirm the Final Award, in part, on the basis

of that ruling (*see* Amerisure Br., ECF #40 at 20-21, Pg. ID 1961-1962) –

Everest's primary briefs do not even mention the exception.[12]   Nor did Everest's oral argument to the Court demonstrate an error in the Panel's ruling that the exception was "applicable."   During argument, the Court twice specifically asked Everest's counsel about this aspect of the Panel's ruling.   In response to the first question, counsel focused on the *separate* Incidental Exception Language in the Asbestos Exclusion.[13]   In response to the second question, Everest's counsel said

_____

[12]  The Panel's ruling on the Generally-Applicable Incidental Exception to the Treaties' Exclusions is included in paragraph 12 of the Final Award.   The only reference to this paragraph of the Final Award in Everest's primary briefs (i.e., all of its briefs filed before the motion hearing before this Court) is included in footnote 11 of Everest's brief in support of its Motion to Vacate.  (*See* ECF #31 at 26, n. 11, Pg. ID 532.)   This footnote states, in its entirety: "The panel majority also did not attempt to interpret the so-called 'escape clause,' merely concluding that it was 'applicable.'" (*Id.*)   This footnote confuses the Panel's ruling on the "escape clause" with its ruling on the separate Generally-Applicable Incidental Exception to the Treaties' Exclusions.   In the very paragraph of the Final Award cited by Everest, the Panel unanimously held, contrary to Everest's claim, that the "escape clause" did *not* apply: "The panel is unanimous in rejecting Amerisure's argument that the so-called 'escape clause,' the last paragraph of the [Direct Access Treaty] [] applies in this case."  (Final Award at 6, ¶12, Pg. ID 187.)   In that same paragraph of the Final Award, the Panel held, by a 2-1 vote, that the Generally-Applicable Incidental Exception to the Treaties' Exclusions was "applicable."   Everest's briefs do not contain any argument concerning this latter holding.

[13]  The Court asked Everest's counsel at the motion hearing how Everest could "get around the fact that even if [Everest won] on the known exclusion[,] [it would] lose under the incidental exception to the exclusion as [the Panel] note[ed] in paragraph 12 of the award on page 6 of the award?"  (The "Motion Transcript," ECF #44 at 95, Pg. ID 2444.)   In response, Everest's counsel referred the Court to "the litany of types of activities that were stated in the first paragraph of the exclusion." (*Id.*) The Generally-Applicable Incidental Exception to the Treaties' Exclusions did not consist of multiple paragraphs; it was a single sentence. (Direct Access Treaty at 41, Pg. ID 280.)   In contrast, the Incidental Exception Language in the Asbestos

only that the Panel's finding that the exception was "applicable" was not "tethered to the contract in any respect." (Mot. Tr. at 97, Pg. ID 2446.)  This conclusory response falls short of the showing required to establish that the Panel exceeded its powers.  Indeed, this response does not identify any specific language in the Treaties that expressly conflicts with the Panel's holding that the Generally-Applicable Incidental Exception to the Treaties' Exclusions was "applicable" to the Asbestos Exclusion.

Finally, in its post-hearing supplemental brief "addressing whether the FAA or Michigan arbitration law" governs, Everest complained in passing that the Panel "inexplicably rul[ed] that [**Company X**'s] <u>undisputed</u> main product (asbestos-containing steam traps) was a 'minor and incidental part of [its] total … products.'" (Everest Supp. Br., ECF #45 at 5, Pg. ID 2478; emphasis in original.) But under Michigan law (which Everest asks this Court to apply), Everest may not attack the Panel's factual findings in these proceedings. *See Muskegon Central Dispatch 911*, 462 Fed. App'x at 524 (quoting *City of Ann Arbor*, 771 N.W.2d at 854).  Likewise, Everest's perfunctory attack on the Panel's "minor and incidental" finding is not sufficient to warrant setting it aside under federal law. *See DBM*

---

Exclusion appears in two paragraphs. (*Id.* at 7, Pg. ID 246.)  Moreover, the Incidental Exception Language in the Asbestos Exclusion identifies specific activities; the Generally-Applicable Incidental Exception to the Treaties' Exclusions does not.  Thus, counsel's reference to the specified activities shows beyond any doubt that he was referring to the Incidental Exception Language in the Asbestos Exclusion.

*Technologies, Inc. v. Local 227, United Food & Commercial Workers Int'l Union*, 257 F.3d 651, 657 (6th Cir. 2001) (reaffirming that standard governing review of arbitrator's factual findings "is even more stringent" than already-deferential standard of review for awards and that even "silly" fact-finding "is an insufficient basis to vacate an arbitrator's award"). And to the extent the sentence fragment quoted above from Everest's post-hearing brief is an argument that the Panel exceeded its powers, it falls well short of the required showing.

Everest has simply not carried its heavy burden to show that the Panel exceeded its powers when it concluded that the Generally-Applicable Incidental Exception to the Treaties' Exclusions – which, on its face, applies to *all* of the listed exclusions[14] – was "applicable" to the Asbestos Exclusion and to Amerisure's claim.[15]

---

[14] The Court recognizes that there may be a reasonable argument that the Generally-Applicable Incidental Exception to the Treaties' Exclusions does not apply to asbestos-related claims. One could argue that the Incidental Exception Language in the Asbestos Exclusion is the relevant exception with respect to asbestos-related claims (and controls over the Generally-Applicable Incidental Exception to the Treaties' Exclusions) because it is more directly-applicable and is located in the Asbestos Exclusion itself. But Everest has *not* made this argument. Thus it is not before the Court, and the Court need not consider it. *Cf. Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived"). And even if the Panel's reading of the Generally-Applicable Incidental Exception to the Treaties' Exclusions is not the best reading – and even if a court may have interpreted the exception differently –the Panel's reading of the exception does not expressly

**E.      Everest Is Not Entitled to Relief on the Ground That the Panel Exceeded Its Powers by Ruling That the [Company Y] Losses Were "In the Case"**

The Final Award required Everest to indemnify Amerisure for amounts that Amerisure paid to **[Company Y]**, an affiliate of **[Company X]** (the "**[Company Y] Losses**").   Everest argues that the Panel "had no jurisdiction" to award that relief because "Amerisure's arbitration demand and position statement only referenced **[Company X]**." (ECF #31 at 26-27, Pg. ID 532-533.)   Everest presented this argument to the Panel, and, "after due deliberation," the Panel rejected it, holding "on the morning of the hearing's final day that the **[Company Y Losses]** were 'in the case.'"  (Final Award at 2, Pg. ID 183.)  Everest insists that this Court may review the Panel's ruling on the **[Company Y]** Losses *de novo* (albeit with a "thumb on the scale in favor of arbitration") because that ruling related to the Panel's "jurisdiction." (Mot. Tr. at 105; quoting *Solvay*, 442 F.3d

conflict with the plain language of the Treaties.  Thus, the Panel did not exceed its powers.

[15]  As noted above, the Panel also discussed whether the Incidental Exception Language in the Asbestos Exclusion applied and whether, for that independent reason, the Asbestos Exclusion did not bar Amerisure's claim. (*See* Final Award at 6, ¶11, Pg. ID 188.)  But while the Panel discussed this issue, it did not clearly rule on it.  The Panel said that it "may not need to reach the issue," and while the Panel's comments appear to indicate that it was inclined to find that the exception did apply and did allow for coverage despite the Asbestos Exclusion, the Panel did not expressly state its conclusion.   (*Id.*)   At oral argument on the motions, Amerisure urged the Court to confirm the Final Award, in part, on the basis of the Panel's discussion of this exception.  However, since it is not clear to the Court that the Panel made any ruling on this exception, the Court declines to address whether that exception applies.

471.)   Everest contends that the Panel's assumption of jurisdiction over the **[Company Y]** Losses cannot withstand such review.   The Court disagrees with Everest's proposed standard of review and its conclusion.

The Panel's ruling that the **[Company Y]** Losses were "in the case" is not subject to *de novo* review simply because it related to the Panel's "jurisdiction." An arbitration panel has "jurisdiction" over a dispute if two conditions are met: (1) the dispute is subject to arbitration under the parties' contract and (2) the parties have, in fact, submitted the dispute to the panel.   It is the first "jurisdictional" question – whether a dispute is arbitrable – that receives independent, *de novo* review in federal court. *See Solvay*, 442 F.3d at 476-477.   In sharp contrast, an arbitrator's determination of the second "jurisdictional" question – whether the parties in fact submitted an arbitrable claim for arbitration – is entitled to great deference.   Indeed, "[t]he extraordinary deference given to an arbitrator's ultimate decision on the merits applies equally to the arbitrator's threshold decision that the parties have indeed submitted a particular issue for arbitration." *International Association of Machinists and Aerospace Workers v. Tennessee Valley Authority*, 155 F.3d 767, 772 (6th Cir. 1998) (quoting *Champion International Corp. v. United Paperworkers International Union*, 779 F.2d 328, 335 (6th Cir. 1985)). This rule applies with full force in the context of arbitration proceedings involving reinsurance disputes. *See United States Life Insurance Company v. Superior*

*National Insurance Company*, 591 F.3d 1167, 1178 (9th Cir. 2010) (holding in dispute between insurer and reinsurer over scope of arbitration demand that arbitration "panel's understanding of its scope of authority is entitled to the same level of great deference as its determination on the merits") (internal punctuation omitted).

Here, the "jurisdictional" issue before the Court is not one of arbitrability that the Court reviews *de novo*. Indeed, the dispute over Everest's liability for the **[Company Y]** Losses undoubtedly falls within the scope of the Treaties' broad arbitration provisions and is thus plainly subject to arbitration. Everest does not contend otherwise. Instead, the "jurisdictional" issue here is whether the parties submitted their admittedly-arbitrable dispute about the **[Company Y]** Losses to the Panel for resolution. The Panel's answer to that question – that the parties did submit their dispute over the **[Company Y]** Losses to arbitration – is entitled to "extraordinary deference." *International Association of Machinists and Aerospace Workers,* 155 F.3d at 772

The Court declines to disturb the Panel's ruling that the parties submitted their dispute over the **[Company Y]** Losses for decision. Amerisure explained to the Panel that while its original demand may not have used the name "**[Company Y]**," the amounts included in that demand *did* include payments that Amerisure made to **[Company Y]**. Everest did not dispute that assertion before the Panel and

56

did not dispute it before this Court. (*See* Mot. Tr. at 113-114, Pg. ID 2462-2463.) Moreover, Amerisure filed a letter brief with the Panel in which it set forth in detail the many ways in which the parties addressed the **[Company Y]** losses in the proceedings leading up to the arbitration hearing (including discovery and pre-hearing filings). (*See* Amerisure Letter Brief, ECF #40-11, Pg. ID 2127-2133.) Amerisure's detailed showing amply supports the Panel's conclusion that the parties submitted their dispute over the **[Company Y]** Losses for decision.

Everest admittedly had some support for its argument to the Panel that the **[Company Y]** Losses were not sufficiently identified in Amerisure's demand for arbitration and were not part of the arbitration proceedings. Everest explained to the Panel that Amerisure objected to a discovery request concerning **[Company Y]** on the ground that **[Company Y]** was "not at issue in this arbitration." (Discovery Response, ECF #33-5 at 5, Pg. ID 1382). However, Amerisure explained to the Panel that it made this objection early in the proceedings – nearly a year before the originally scheduled June 2013 arbitration hearing – that it withdrew the objection; and that in the many months following the objection, the parties proceeded on the clear understanding that the **[Company Y]** Losses were at issue. (*See* Amerisure's Letter Brief, ECF #40-11, Pg. ID 2127-2133.) The Panel accepted Amerisure's explanation, and that decision by the Panel was not objectively unreasonable. The

Court will not vacate that portion of the Final Award which requires Everest to indemnify Amerisure for the **[Company Y]** Losses.

## F.    The Court Must Confirm the Final Award

For all of the reasons stated above, the Court finds no justification to vacate, modify, or correct the Final Award.  Accordingly, the Court must confirm the Final Award. *See* 9 U.S.C. § 9; *Barcume v. City of Flint*, 132 F. Supp. 2d 549, 555 (E.D. Mich. 2001); *Gordon Sel-Way*, 475 N.W.2d at 709 ("In this context, the court rules provide the court with three options: it may confirm, modify or correct, or vacate the award").

## CONCLUSION

For all the reasons stated above, **IT IS HEREBY ORDERED** that Amerisure's Motion to Confirm (ECF #2) is **GRANTED** and Everest's Motion to Vacate (ECF #23) is **DENIED.**

**IT IS FURTHER ORDERED** that within seven calendar days, Amerisure shall submit to the Court through the Utilities function of CM/ECF, a proposed Judgment that confirms the Final Award.  Amerisure shall also serve a copy of the proposed Judgment on Everest and file a Proof of Service with this Court.  Everest

shall have seven calendar days from the date of service to file an objection with the

Court to the form of the proposed Judgment.


                                    s/Matthew F. Leitman
                                    MATTHEW F. LEITMAN
Dated:  March 18, 2015              UNITED STATES DISTRICT JUDGE


        I hereby certify that a copy of the foregoing document was served upon the
parties and/or counsel of record on March 18, 2015, by electronic means and/or
ordinary mail.

                                    s/Holly A. Monda
                                    Case Manager
                                    (313) 234-5113